**In re Robert Ray WARNER, Debtor.**

**Bankruptcy No. LAX 88–53708–LF.**

United States Bankruptcy Court,
C.D. California.

June 21, 1989.

234

Nancy Curry, Los Angeles, Cal., Chapter 13 Trustee.

Gary Kleinman, Hollywood, Cal., for debtor.

## OPINION DENYING CONFIRMATION OF PLAN

LISA HILL FENNING, Bankruptcy Judge.

### I. INTRODUCTION

In his chapter 13 plan, Debtor Robert Ray Warner proposes to pay his nondischargeable child support obligations in full, but pay his other, non-priority unsecured creditors nothing. The chapter 13 trustee objects to confirmation of the plan on the grounds that such discriminatory treatment violates the fundamental fairness principles of chapter 13. For the reasons set forth below, the trustee's objection is upheld and confirmation of Debtor's plan is denied.

### II. FINDINGS OF FACT

The following facts are uncontroverted:

1. Debtor filed a petition under chapter 13 of the United States Bankruptcy Code on August 15, 1988. The plan confirmation hearing was initially set for September 27, 1988 but was continued several times to allow time for proper service of the plan and further briefing.

2. Debtor's plan "bifurcates" his non-priority unsecured claims into two "subclasses": subclass (a) consists of Debtor's child support arrearages in the amount of $6,000.00; and subclass (b) includes his re-

maining unsecured claims in the approximate amount of $57,000.00.

3. Debtor's plan proposes 100% payment to subclass (a). Subclass (b), however, would receive no payment at all.

4. Debtor's plan calls for payments of $229.17 per month for 36 months. This amount constitutes all of Debtor's projected disposable income as calculated according to the standard cost of living allowances generally used by the chapter 13 trustee.

5. The subclass (b) creditors would not receive any payments in a liquidation under chapter 7.

6. Debtor concedes that he filed his chapter 13 case to prevent collection of his child support arrearages under state law.

## III. CONCLUSIONS OF LAW

1. Debtor's commitment to dedicate essentially all of his disposable income to plan payments satisfies the "best efforts" test of 11 U.S.C. § 1325(b)(1)(B).

2. Section 1322(a)(3) requires that a chapter 13 plan "provide the same treatment for each claim within a particular class." Thus, a chapter 13 plan could not properly include child support and other unsecured claims in a single class, yet treat them differently.

3. Because of the format constraints imposed on Debtor by the Chapter 13 forms required in this district, Debtor's plan should properly be viewed as creating two separate classes of unsecured claims. Section 1322(b)(1) requires that the plan "not discriminate unfairly against any class so designated." Paying one class of unsecured creditors in full, while paying nothing to the other constitutes unfair discrimination. Such treatment is impermissible in a chapter 13 plan.

4. Debtor argues that he could accomplish the same result by first discharging all dischargeable debts in a chapter 7 case, then filing a chapter 13 plan to take care of the nondischargeable debt. This argument is unpersuasive. Debtors cannot accomplish through a "chapter 20" filing that which is prohibited in a chapter 13 filing.

5. Filing a chapter 13 case to prevent the collection of child support arrears under state law does not constitute "good faith" under 11 U.S.C. § 1325(a)(3).

## IV. DISCUSSION

### A. *Standards for Confirmation of Chapter 13 Plans.*

Bankruptcy Code Section 1325 sets forth the requirements for confirmation of a chapter 13 plan. The debtor, as proponent of the plan, bears the burden of proof that all of the requirements are satisfied. *In re Wolff,* 22 B.R. 510, 512 (9th Cir. BAP 1982).

When a chapter 13 trustee objects to confirmation, the Court must determine whether the plan satisfies the "best efforts" test of Section 1325(b), which requires that all of the debtor's "projected disposable income" must be applied to payments under the plan. It is undisputed that this test has been met. The chapter 13 Trustee concedes that the proposed payments of $229.17 per month constitute all of Debtor's disposable income, as that term is defined in Section 1325(b)(2).

Satisfying the "best efforts" test is a necessary, but *not* sufficient condition for confirmation. *In re Warren,* 89 B.R. 87, 94 (9th Cir. BAP 1988). The plan must also comply with all six provisions of Section 1325(a). At issue here are: (1) whether the classification and treatment of claims are permissible under Section 1322, as required by Section 1325(a)(1); and (2) whether the plan is proposed in "good faith" within the meaning of Section 1325(a)(3).

### B. *Discriminatory Treatment of Unsecured Claims*

The format of the mandatory chapter 13 plan form used in this district does not contemplate multiple classes of general unsecured creditors. For that reason, Debtor included both the child support obligation and other unsecured claims in "class four," but referred to the class as "bifurcated."

■ Section 1322(a)(3) mandates that a plan "provide the same treatment for each claim within a particular class." Paying 100% on one claim and 0% on the rest of the claims in the class would violate this prohibition.

What Debtor plainly intended, however, was that two separate classes of unsecured claims be created. Section 1322(b)(1) allows more than one class to be created in a chapter 13 plan:

"(b) Subject to subsections (a) and (c) of this section, the plan may—

"(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title but may not discriminate unfairly against any class so designated...."

Thus, the issue is whether the classification unfairly discriminates against any class of creditors. That the plan "discriminates" is obvious: it pays the nondischargeable claim in full, yet pays nothing to the other unsecured creditors. Under Section 1322(b)(1), the question is whether this discrimination against the holders of dischargeable unsecured debts is unfair.

The Code does not define "unfair discrimination". Nor does the legislative history. A provision for classification of chapter 13 claims appeared early in the drafting process, prompted by a perceived need to provide greater flexibility than had existed under old Chapter XIII's mandate that all unsecured creditors be treated alike. The language prohibiting unfair discrimination between classes was added later, but the committee reports shed no light on its interpretation. *See, e.g., In re Lawson,* 93 B.R. 979 (Bankr.N.D.Ill.1988) (discussing the legislative history of Section 1322(b)(1) in detail).

■ Thus, the legislative history of this section provides no guidance as to the circumstances in which Congress intended to permit preferred treatment of one class of chapter 13 general unsecured creditors over another, nor as to the nature or extent of the differential treatment to be permitted. Because ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws, this Court

should "act very cautiously" in exercising this general equitable power in favor of one group of unsecured creditors at the expense of others. *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1575, modified, 774 F.2d 1390 (9th Cir. 1985); *cert. den. sub nom. Torres v. Eastlick,* 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986).

*In re Wolff,* 22 B.R. 510 (9th Cir. BAP 1982), sets forth the four-part test most frequently used to determine the fairness of discrimination under Section 1322:

"(1) [W]hether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination."

*Id.* at 512. The *Wolff* court framed the issue in terms of whether the debtor's "future viability was dependent on the cooperation of those [favored] creditors." *Id.* at 511. Because the debtor there failed to prove that he needed good relations with those creditors to succeed in his plan, the BAP reversed the order that had allowed confirmation over objection.

Debtor argues that the discrimination here does have reasonable basis: as a matter of law, he has to pay the nondischargeable support obligation in full, whereas the other unsecured debts are dischargeable. Debtor also argues that the discrimination is necessary to carry out the plan. If all of his unsecured claims were treated the same, about only 10% of the total unsecured debt could be paid over the three-year life of the plan. More than $5000 would still be owed on the nondischargeable debt at the end of the three years. This calculation also demonstrates that a lesser degree of discrimination—such as a 75%/25% or 60%/40% split—would not result in significant payments to the general unsecured creditors. Thus, the degree of discrimination proposed by Debtor does appear to be necessary for the plan to accomplish its objective, that is, paying the nondischargeable debt in full in three years.

Thus, from Debtor's perspective, the proposed discrimination is not arbitrary, but rather was rationally designed and necessary to accomplish a specific result for his sole benefit. The question is whether the plan was filed in "good faith". Honesty, however, is *not* sufficient to establish good faith within the meaning of Section 1325(a)(3). The result sought to be achieved must be consistent with—not contrary to—the principles and purpose of chapter 13.

### C. *The Good Faith Test of Section 1325(a)(3)*

What constitutes "good faith" depends upon all the circumstances of the particular case. *In re Goeb*, 675 F.2d 1386, 1390 (9th Cir.1982), sets forth the general standard to be applied in chapter 13 cases.

The proposed chapter 13 plan in *Goeb* provided full payment of secured and priority tax claims over the five years of the plan, but paid only 1% to general unsecured creditors. It was undisputed that the purpose of the plan was to provide extended repayment terms for the past due taxes. The Court rejected the proposition that substantial repayment of unsecured creditors was a prerequisite to finding that the plan was filed in good faith. The court held that:

> "[T]he proper inquiry is whether the Goebs acted equitably in proposing their Chapter 13 plan. A bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his chapter 13 case in an inequitable manner. Though it may consider the substantiality of the proposed repayment, the court must make its good-faith determination in the light of *all* militating factors."

675 F.2d at 1390 (Emphasis in original; footnote omitted.)

The Ninth Circuit noted that the Goebs' plan complied with all other requirements of Section 1325, and provided complete repayment of both secured and priority claims, which might not have been fully satisfied in a chapter 7 case. Thus, the Goebs' intent to use chapter 13 to extend their tax payments did not by itself violate the good faith requirement, even though they could not afford substantial repayment of their unsecured creditors. Absent specific evidence of inequitable conduct or purpose, the Goebs were entitled to confirm their plan.

In *Goeb*, the several classes of creditors were to be paid in order of their priority under the Code. By contrast, here, the only payments go to the chapter 13 Trustee for administration, to the Debtor's attorney, and to the Debtor's ex-wife. Unlike *Goeb*, no payments are to be made through the plan to any other secured, priority or unsecured creditors. Unlike *Goeb* the absolute priority rule is ignored. It is also significant that, Debtor has proposed only a 36-month plan, which coincidentally just covers the child support claim. A 60-month plan could have provided for some payments to other unsecured creditors as well.

### D. *The Competing Principles of State and Federal Law.*

Debtor has been perfectly forthright about his purposes. He hopes to avoid garnishment of his wages and the enforcement of the child support order under California law. The "good faith" issue requires determination of whether that purpose is consistent with the goals of chapter 13.

#### 1. *The Purpose of Chapter 13*

Chapter 13 is designed to encourage debtors to make a sincere effort to repay as much of their pre-petition debt as they can afford from their future income. As the legislative history indicates:

> "The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for repayment of his debts over an extended period.
>
> "The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his assets. In a liquidation

case, the debtor must surrender his non-exempt assets for liquidation and sale by the trustee. Under chapter 13, the debtor may retain his property by agreeing to repay his creditors.... The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 118, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6079.

The reward for successfully completing a chapter 13 plan is a broader discharge than is available in a chapter 7 case. Given this purpose, the failure of a chapter 13 plan to provide substantial repayment to unsecured creditors is "one piece of evidence that the debtor is unfairly manipulating Chapter 13 and therefore acting in bad faith." *In re Goeb, supra,* 675 F.2d at 1391. *See also, In re Silva,* 82 B.R. 845, 846 (Bankr.S.D.Ohio 1987) ("Chapter 20" case not filed in good faith where debtors made no "meaningful attempt" to repay unsecured creditors).

The issue of how to treat spousal and child support claims arises only in chapter 13 cases. Actions to enforce pre-petition support orders are not affected by the automatic stay under any other chapter. In chapter 7 and 11 cases, Section 362(b)(2) permits such collection actions to proceed undisturbed by the bankruptcy filing, because debtor's post-petition earned income is not "property of the estate" under Section 541(a). Under Section 1306, however, upon the filing of a chapter 13 petition debtor's earned income becomes "property of the estate" protected by the stay. Thus, in chapter 13 cases debtor's former spouse and children compete with all unsecured creditors for payments from the debtor's after-tax income under a plan.

■■■ Nothing in the Code entitles non-dischargeable child support claims to any priority over other unsecured claims. Non-dischargeability does not guarantee repayment in full, but rather establishes the continuing liability of the debtors for repayment of any deficiencies remaining after discharge and the ratable distribution to all creditors from the available assets of the estate. In chapter 7 cases, the debtor's former family competes only with any holders of other nondischargeable claims for payments from a debtor's future income.

By exempting claims for child and spousal support arrearages from discharge under any chapter but staying their collection only under chapter 13, Congress has created a unique status for such claims in chapter 13 cases, without providing any guidance as to how they should be treated. In this context, the chapter 13 policy that encourages debtors to repay their pre-petition debts from future income conflicts with two equally strong competing policies of federal and state law.

### 2. Federal Policy Against Interference in Family Law Matters

Family law issues and disputes "are pre-eminently matters of state law." *Mansell v. Mansell,* —— U.S. ——, ——, 109 S.Ct. 2023, 2027, 104 L.Ed.2d 675 (1989). This general policy has been expressed as follows:

"There is, and ought to be, a continuing federal policy to avoid handling domestic relations cases in federal court in the absence of important concerns of a constitutional nature. *See, e.g., Ohio ex rel. Popovici v. Angler,* 280 U.S. 379, 383, 50 S.Ct. 154, [154] 74 L.Ed. 489 (1930); *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, [852–53] 34 L.Ed. 500 (1890); *Hernstadt v. Hernstadt,* 373 F.2d 316 (2d Cir. 1967). Such cases touch state law and policy in a deep and sensitive manner, and '[a]s a matter of policy and comity, these local problems should be decided in state courts.' *Buechold v. Ortiz, supra,* 401 F.2d [371] 373 [9th Cir.1968]."

*In re Overman,* 563 F.2d 1287, 1292 (8th Cir.1977) (remanding divorce action to state court; presence of United States as garnished employer insufficient to justify retention of jurisdiction.) This policy has been frequently echoed in bankruptcy cases struggling with the support issue.

Perhaps an extreme example of this deference is *In re Garrison,* 5 B.R. 256 (Bankr.E.D.Mich.1980), in which the bankruptcy court observed:

"From a historical view, both the Constitution and court decisions conclusively hold that the consummation and dissolution of marriages is a matter reserved to the states ... [There is] a clear intent insofar as the Constitution permits to leave to the states, with as little interference as possible, the exclusive right to regulate the dissolution of marriages and to provide for the maintenance and support of those affected thereby. This view is harmonious with Congressional policies expressed in Sections 523(a)(5) and 1328 of the Bankruptcy Code, which continued the policy in previous bankruptcy legislation, holding child support and alimony obligations exempt from the effect of a discharge." *Id.* at 259. (Footnotes omitted.)

In an extraordinary *en banc* ruling, the bankruptcy court reasoned in *Garrison* that Congress did not intend the broad scope of the changes wrought by the enactment of Section 362 and the automatic stay "to thwart and impede the enforcement of nondischargeable alimony and child support obligations by the states against those who seek refuge in the bankruptcy courts." *Id.* The court attempted to reconcile the new chapter 13 stay provisions with the general federal policy against interfering in state regulation of family matters. It held that the filing of a chapter 13 petition did not automatically stay enforcement of such obligations, Section 1306 notwithstanding, because "[t]hese sections were not intended to make the bankruptcy courts a sanctuary for those who would avoid alimony and support obligations." *Id.* at 260.

The significance of *Garrison* lies in its recognition of the conflict between chapter 13 and state enforcement of family law. In its struggle to reconcile these policies, however, *Garrison* adopts an interpretation of Section 362 and 1306 that has not been followed by other courts addressing the issue. *E.g., In re McCray,* 62 B.R. 11 (Bankr.D.Colo.1986) (automatic stay applies to bar collection of support arrearages in chapter 13 cases, but should be lifted because arrearages cannot be put through a plan); *In re Lanham,* 13 B.R. 45 (Bankr.C. D.Ill.1981) (because Section 1306 protects debtor's earnings, automatic stay bars post-petition entry of support order by state court; arrearages can properly be put through plan). *Cf. In re Stringer,* 847 F.2d 549 (9th Cir.1988) (Section 362(b)(2) must be narrowly construed; holding that, in a chapter 7 case, actions to modify support orders require relief from stay); *In re MacDonald,* 755 F.2d 715, 717 (9th Cir. 1985) (relief from stay in a chapter 7 case is required to seek modification of state court support order, but should be liberally granted because bankruptcy courts must "avoid incursions into family law matters.").

Another bankruptcy case emphasizing deference to the state courts in support matters is *Caswell v. Lang,* 757 F.2d 608 (4th Cir.1985). The district court and court of appeals affirmed the bankruptcy court's order denying confirmation of a chapter 13 plan that provided for payments of 100% of child support arrearages and 25% of other unsecured claims. The court held that past-due child support obligations may not be included in a chapter 13 plan. The court explained:

"[I]t would result in great injustice to require children to await a bankruptcy court's confirmation of a debtor's Chapter 13 plan before permitting them to enforce their state court-determined right to collect past due support payments. The Bankruptcy Code may not be used to deprive dependents, even if only temporarily, of the necessities of life.

"Equally important, a federal court may not interfere with the remedies provided by a state court in these areas of particular state concern, provided, of course, that these remedies are constitutional. To permit child support arrearages to be included in a Chapter 13 plan would invite a federal bankruptcy court to alter or modify a state court decision regarding the payment and discharge of the overdue debt. This we cannot countenance....

"The state court's determination respecting the rights of the parties in these areas of state concern should not be dis-

turbed by federal bankruptcy courts. Past due child support obligations may not be included in a Chapter 13 plan under the bankruptcy code." (Footnotes omitted.) *Id.* at 610–11.

In view of the well-established federal policy reserving family law matters to the states, this Court must examine the impact of the proposed chapter 13 plan on the laws and policies of the State of California governing enforcement of support awards, and determine to what extent the confirmation of the chapter 13 plan proposed here would interfere with the state law governing collection of support awards.

### 3. *State Laws on Enforcement of Support Awards*

Debtor in this case proposes to limit his payments on his child support arrearages to approximately 14% of his take-home pay. His chapter 13 plan would thus sharply restrict payments that his former family would otherwise be entitled to seek under state law.

Subject to federal ceilings established for wage withholding orders, California law grants priority to wage withholding orders for support over any other withholding order. Cal.Civ.Proc.Code § 706.030(b)(2). Up to 50% of a debtor's after-tax earnings can ordinarily be withheld for support, although the state court may increase that percentage to as much as 65% if the support judgment debtor is delinquent more than 12 weeks, and is not supporting a second family. Cal.Civ.Proc.Code § 706.052(a). *See also,* 15 U.S.C. § 1673(b)(2). By contrast, other creditors are entitled to garnish only at most 25% of a judgment debtor's after-tax wages. 15 U.S.C. § 1673(a)(1). *See also,* Cal.Civ.Proc. Code § 706.050. Thus, under state law, Debtor's former spouse could garnish as much as $1040.00 per month of his $1600.00 net income, whereas the plan provides for payments of just over $225 per month.

The state court has the power to modify the original support order upon proof that the amount awarded is too high in relation to Debtor's current income and expenses. That relief, however, can only be prospective under California law. A motion for modification of child support cannot affect arrearages that accrued before the modification motion is noticed. Cal.Civ.Code § 4700(a)(1). By precluding *ex post facto* modification of the amounts due, the state's laws limiting modification of support awards are designed to encourage payments on a current basis and to discourage support debtors from allowing arrearages to accumulate. Thus, as the state courts are bound by the support order with respect to the amount of arrearages, so is this Court bound. Debtor cannot now challenge the amount of that prior support award.

Unlike other debts, willful failure to make support payments is punishable under the state court's contempt powers, which include the power to incarcerate. Cal.Civ.Proc.Code § 1209.5. The state's interest in assuring payment of support obligations is not purely altruistic. The state bears the cost of support through the Aid to Families with Dependent Children program when the parent fails to pay.

According to the June 1987 Report of the California Senate Task Force on Family Equity ("Task Force Report"),

"[a]lmost 90 percent of the children who are receiving Aid to Families with Dependent Children (AFDC) have a living parent absent from the home who is either paying insufficient child support or none at all." *Id.* at VI–2.

As a prerequisite for participation in AFDC, the state requires the former spouse and children to assign their right to collect support arrearages to the state which becomes the real party in interest in collection efforts. *See* 42 U.S.C. § 602(a)(26); Calif.Civ.Code § 4702. According to the *Ninth Annual Report to Congress: 1983–1984* submitted by the Federal Office of Child Support, in 1984 alone, the California district attorneys' support enforcement units initiated actions in 1,002,917 cases (670,737 AFDC cases; 332,-180 non-AFDC cases). *Id.,* Tables 21 and 22. The amounts involved are significant: as of the end of 1986, delinquent child

242

support payments in California totaled $1.25 billion, according to the *Task Force Report*, p. VI–4.

To respond to the overwhelming enforcement problems, the California legislature established mandatory wage assignments in all child support orders after January 1, 1987. Calif.Civ.Code § 4701(a)(1). It is precisely such wage assignments that chapter 13 filings cause to be vacated.

### 4. *Balancing the Competing State and Federal Interests.*

■ Confirming Debtor's proposed plan would entirely divest the state court of any jurisdiction to enforce payments of child support arrearages unless and until the chapter 13 case were to be dismissed. If Debtor fails to make his plan payments, either his former spouse or the chapter 13 trustee would have to move for dismissal of the case, which usually takes several months due to administrative delays and notice periods. The former spouse would have to seek enforcement of the support award in state court, adding yet another delay which would be compounded by the time required to implement any garnishment order. Thus, delays from the date of plan payment default to effective state garnishment order can easily run four to six months, or more.

In addition, if a wage garnishment order is in effect pre-petition, the confirmation of a chapter 13 plan is usually delayed by one to three months to await the termination of the garnishment and the receipt of funds by the debtor to fund the plan payments. Thus, the former family of a debtor who confirms a plan but fails to make any post-confirmation plan payments, may receive only a few irregular payments for as much as six to ten months as a result of the bankruptcy case. This is, of course, the "worst case" scenario; by contrast, Debtor here made his pre-confirmation payments in a timely manner, and might continue to do so post-confirmation. But the "worst case" analysis demonstrates the nature and extent of the potential interference by a chapter 13 case with the state child support system.

Under what circumstances, then, do the policies embodied in chapter 13 outweigh the state's family law concerns? First, it is important to note that the "fresh start" goal of the bankruptcy laws is not threatened here: a "fresh start" is available in chapter 7 with respect to all dischargeable debts. Rather, the issue is the availability of the broader chapter 13 discharge in exchange for the commitment of future income surplus to fund the plan.

This plan as proposed does not in any way serve that chapter 13 goal. *None* of Debtor's creditors benefit from this plan. The only one being paid anything is his ex-wife, but that is at a rate $800 per month lower than she could have received under state law. The only benefit is to Debtor: he can avoid any harsh consequences from his failure to pay the child support ordered by the state court. Filing a bankruptcy case to defraud a former spouse or to evade the duty to support dependent children has long been recognized as an abuse of the bankruptcy process. *See, e.g., In re Victory Construction Co., Inc.,* 9 B.R. 549, 559 (Bankr.C.D. Cal.1981), *appeal dism'd as moot,* 37 B.R. 222 (9th Cir. BAP 1984); *Gonzalez Hernandez v. Borgos,* 343 F.2d 802 (1st Cir. 1965).

This plan was thus proposed in "an inequitable manner" within the meaning of *Goeb* and therefore is unconfirmable. The question then arises whether Debtor should be allowed an opportunity to amend the plan. Given Debtor's income, however, only a relatively low percentage payout to general unsecured creditors can be achieved under any scenario.

Some bankruptcy courts have confirmed chapter 13 plans providing repayment in full of child support arrearages combined with a low payment to other unsecured creditors. Other courts have rejected such plans.

One line of cases prohibits debtors from including support arrearages in chapter 13 plans. For example, *Caswell v. Lang, supra,* 757 F.2d 608 (4th Cir.1985), held that past due child support cannot go through a plan because the federal court should not

interfere in matters reserved to the state, thereby rejecting a proposed plan that provided 100% for the child support claim and 25% to the other unsecured creditors. *See also, e.g., In re McCray*, 62 B.R. 11, 12 (Bankr.D.Colo.1986) (granting relief from stay to child support creditor, holding that "a debt for past due child support may not be provided for in a Chapter 13 plan"). These cases did not consider the section 1322 question of whether a low payout plan could be confirmed if the child support payments were provided for *outside* the plan.

This converse situation confronted the bankruptcy court in *In re Haag*, 3 B.R. 649 (Bankr.D.Ore.1980). That court confirmed a plan providing a return of 25% to general unsecured creditors, where the support arrearages were to be paid in full *outside* the plan. The *Haag* court treated this arrangement as differential classification under Section 1322, but found it not to be unfair in view of the nondischargeability of the debt being paid outside the plan. On the other hand, the court did not consider whether the child support claim could properly have been included in the plan itself, *i.e.,* the *Caswell* fact pattern. If a *Haag*-type plan is proposed, with arrearages and current support to be paid outside the plan, then the chapter 13 plan must not impair the debtor's ability to meet those obligations. *See, Gonzalez–Hernandez v. Borgos, supra,* 343 F.2d 802 (1st Cir.1965) (denying confirmation to a Chapter XIII plan where neither the plan nor the budget made allowance for support payments outside the plan.)

Yet another approach allows split-level plans that include arrearages if, and only if, the child or spousal support is to be paid in full. The cases in this category allow differential treatment of the support claim (paid out 100% under the plan), compared to a lower payment to general unsecured claims. *See, e.g., In re Storberg*, 94 B.R. 144 (Bankr.D.Minn.1988) (100%/18% plan confirmed); *In re Lanham*, 13 B.R. 45 (Bankr.C.D.Ill.1981) (100%/70% plan approved where amount to be paid on the child support claim under the plan was only $15 less per month than the state award);

*In re Curtis*, 2 B.R. 43 (Bankr.W.D.Mo. 1979) (approving 100%/10% plan). A variant of this approach is *In re Davidson*, 72 B.R. 384 (Bankr.D.Colo.1987), in which the bankruptcy court held that 100%/15% plans did not discriminate unfairly against the other unsecured creditors, but would be confirmable if and only if the former spouse or the state as assignee of the child support claim expressly consented to the plan. Such express consent would, according to the *Davidson* court, assure that the state court efforts to collect the child support arrearages would not upset the budget assumptions underlying the plan.

The courts that authorize discrimination in favor of child support claims and against general unsecured creditors generally offer two reasons to justify that discrimination. First, they assert that allowing such chapter 13 plans helps assure payment of the child support claims. *See, e.g. In re Storberg, supra,* 94 B.R. at 147; *In re Davidson, supra,* 72 B.R. at 389. These cases do not, however, discuss the potential adverse impact of bankruptcy filings on the state support enforcement system, nor the payment delays that frequently result from the fact of a bankruptcy filing. The unexamined premise appears to be that voluntary payments through a chapter 13 are more likely to result in payment of the child support arrearages than involuntary payments through a wage garnishment or the other remedies enforceable by the contempt powers of the state courts. This premise lacks any logical or empirical basis. Moreover, it violates the strong federal policy in favor of reserving decisions about child support issues to the states.

The second justification offered for approving plans that discriminate between support and other unsecured claims is that the unsecured creditors would not receive any payment in a chapter 7 liquidation anyway; *i.e.,* something is better than nothing. But the purpose of chapter 13 is to achieve *substantial* repayment of creditors. It is true that zero percent plans paying nothing to unsecured creditors are confirmable under appropriate circumstances. *See, e.g., In re Greer,* 60 B.R. 547 (Bankr.C.D.Cal.

1988). Such plans, however, must be consistent with other goals of chapter 13, *e.g.*, the repayment of secured or priority claims. *See, In re Goeb, supra*, 675 F.2d 1386 (9th Cir.1982)

 Minimal payout to unsecured creditors cannot be justified if it can only be achieved by having bankruptcy courts divest the state courts of their jurisdiction over child support enforcement. Pulling these issues into bankruptcy court means the substitution of the judgment of the bankruptcy court for that of the family law court on the key question of how much of the debtor's take-home pay should be used to support the former family. Because of the policies favoring state resolution of support issues, bankruptcy court intervention into this area can be justified only if the benefits to be achieved under the chapter 13 plan are significant enough substantially to outweigh the detrimental impact of the intervention. This test requires the balancing of the competing policies and interests. Close questions should be resolved against intervention, in deference to the special role reserved to the states in family issues.

An example of a compelling case for federal bankruptcy intervention might be when a chapter 13 plan can provide for repayment in full of all creditors, including the nondischargeable child support claim, in a case that would qualify as "no asset" if filed under chapter 7. *Cf. In re Lawson, supra*, 93 B.R. 979 (Bankr.N.D.Ill.1988) (holding that only a 100%/100% plan would be confirmed because no principled justification exists for allowing discrimination between nondischargeable educational loans and other unsecured claims under Section 1322.) In a "full payment" plan, of course, no discrimination issue arises under section 1322 because general unsecured creditors would be paid at the same rate as the nondischargeable educational loan or child support claim.

This court is reluctant to adopt such a *per se* rule that only 100%/100% plans can be confirmed where nondischargeable child support claims are to be paid under a chapter 13 plan. However, only the most compelling of circumstances could justify any discrimination between unsecured claims otherwise equal in priority of payment under the Bankruptcy Code.

 A further issue is whether payment of child support arrearages should be made through the plan or outside the plan. If, before the bankruptcy filing, the state court has fixed an amount for installment payments on the arrearages, whether by garnishment or otherwise, then the bankruptcy court should not ordinarily disturb that payment scheme. The support arrearages should therefore remain outside the plan, subject to the state court enforcement and jurisdiction. On the other hand, if no wage withholding order or other installment payment scheme has been established by the state court, then the bankruptcy court must fix that amount in order to determine the income that will be available to fund payments to other creditors. Under these circumstances, the support arrearages should go through the plan. The burden is on the debtor as plan proponent to provide the necessary evidence to determine how the arrearages should be treated.

### E. *"Chapter 20" Alternative*

 In this case, Debtor acknowledges that no claims other than the child support claim are to be paid under the plan. He defends the manifest unfairness of the proposed payment scheme primarily by arguing that his general unsecured creditors would have not received any payment if he filed a chapter 7 case first, before filing a chapter 13 case to take care of the nondischargeable child support arrearages. Debtor relies on *In re Metz*, 820 F.2d 1495 (9th Cir.1987), as authority for such "chapter 20" filings.

In the *Metz* case, debtor filed a chapter 7 case listing secured creditors—including both a mortgage and judgment liens on his house—and unsecured creditors. Since no nonexempt assets were available to pay claims, his creditors received no payments. On the same day as Metz received his chapter 7 discharge, he filed a chapter 13 plan seeking solely to cure the mortgage arrearages. The plan failed to provide for pay-

ment of interest on the arrearages or for payment of the property tax arrearages. The chapter 13 case was dismissed without prejudice. Several months later, Metz filed a new chapter 13 plan that cured these defects.

The mortgage holder challenged the second chapter 13 filing on grounds of bad faith. The Ninth Circuit held that "a chapter 13 plan may, as a matter of law, cure arrearages on a mortgage debt discharged by chapter 7," provided that the good faith filing requirement of Section 1325(a)(3) is satisfied. *In re Metz, supra,* 820 F.2d at 1498. The Court found that, between filings, the debtor had received an increase in salary sufficient to make the necessary house payments:

> "Such a bona fide change in circumstances is precisely what the bankruptcy judge should examine to determine whether successive filings are proper."

820 F.2d at 1498.

The *Metz* court also emphasized that the anticipated results of the successive filings should be examined against the statutory requirements. 820 F.2d at 1497. The ultimate results must be consistent with the principles and requirements of the Code in order to satisfy the good faith test. The result in *Metz*—the secured arrearages to be paid under the plan, the unsecured claims to receive nothing—was permissible under chapter 13, because no minimum payment requirement is imposed by the Code. 820 F.2d at 1498–99. If Metz had filed a single chapter 13 case, he could have accomplished the same result without violating the priorities set forth in the Code: the *Metz* plan paid a secured creditor that was entitled to absolute priority over all unsecured creditors.

 "Chapter 20" plans are inherently suspect, since an individual debtor is entitled to a discharge of debts no more frequently than every six years. Bankruptcy Code § 727(a). The presumption of bad faith may be rebutted, as in *Metz*, only by evidence of a bona fide change of circumstances. The purpose of the "chapter 20" filing must be tested against the permissible objectives of chapter 13 plans. By contrast to *Metz*, Debtor here proposes to pay only one unsecured creditor, but not the others, a payment scheme that this court has determined to be "unfair discrimination," contrary to the policies and requirements of chapter 13. Whether he attempts this result in one step or two, it remains an impermissible result.

## V. CONCLUSION

Because this Court concludes that the chapter 13 plan does not satisfy the good faith requirement, confirmation is denied. Because no other plan is confirmable under the facts of this case, the chapter 13 case is dismissed. An appropriate order shall be entered forthwith.