**In re Judith CUSHMAN, Debtor.**

**Bankruptcy No. 97–13737–SSM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Jan. 20, 1998.

Kevin M. O'Donnell, Henry & O'Donnell, P.C., Fairfax, VA, for Ford Motor Credit Co.

Klinette H. Kindred, Falls Church, VA, for Debtor.

Gerald O'Donnell, Alexandria, VA, Chapter 13 Trustee.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

This case is before the court on an objection to confirmation that seeks to stake out the limits of good faith in a "chapter 20" filing. Specifically, Ford Motor Credit Company ("Ford"), the sole creditor in this case, has objected to a plan that proposes to pay it only the replacement value of its collateral (an automobile) and to pay nothing on account of the unsecured deficiency claim that was discharged in the debtor's prior chapter 7 case. An evidentiary hearing was held on December 16, 1997, at which counsel for Ford, counsel for the debtor, and the standing chapter 13 trustee appeared. At the conclusion of the hearing, the court took the matter under advisement to review the evidence and the applicable law.

*Facts*

Judith Cushman (the "debtor") filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code in this court on May 19, 1997, some two and a half months after receiving a discharge in a chapter 7 case she had filed in this court, Case No. 96–16490–MVB.[1]

The only asset of significant monetary value reflected on the debtor's schedule B ("Personal Property") is a 1995 Ford Contour automobile. That automobile is the collateral securing Ford, the only creditor listed in her schedules. Schedule D ("Creditors Holding Secured Claims") reflects that Ford holds a secured claim against the debtor's automobile for $9,263, this being the value the debtor places on the vehicle. Under the debtor's plan filed on June 3, 1997, she proposes to treat Ford's claim by payments of $299.00 per month for 48 months to the chapter 13 trustee, representing the value of the vehicle plus interest at the rate of 9.44%.[2]

On June 19, 1997, Ford filed a proof of claim asserting a secured claim in the amount of $15,845.17. Simultaneously, Ford filed the objection to confirmation that is presently before the court. That objection asserts that the debtor had undervalued the car; that the proposed rate of interest was inadequate and should be the contract rate of interest of 17.9%; and that the debtor's plan had not been proposed in good faith. On August 12, 1997, the debtor objected to Ford's proof of claim on the basis that "the claim is unenforceable against the debtor and property of the debtor under applicable law, specifically secured amount exceeds replacement value of the security." After several continuances granted at the joint request of the parties, the court set a valuation hearing for October 10, 1997, in order to determine the replacement value of the vehicle under the standard announced by the Supreme Court in *Associates Commercial Corp. v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The parties, however,

---

1. The date of the chapter 7 discharge was March 1, 1997, and the case was closed on March 4, 1997.

2. These are the debtor's calculations. It would appear, however, that the present value of 48 monthly payments of $299.00, applying a 9.44% discount rate, is actually $11,914.96. Conversely, it would appear that to amortize $9,263.00 over 48 months with interest at 9.44% requires payments of $232.45 per month.

settled the valuation issue prior to the hearing by agreeing to the value proposed in the plan, and Ford has now reasserted its objection that the plan has not been proposed in good faith.[3] The chapter 13 trustee, although present, did not actively participate in the hearing but did file with the court a report recommending confirmation.

The debtor testified at the hearing that she had filed her chapter 7 petition in November 1996, and that during the pendency of her chapter 7 case she remained "current" with her car payments to Ford. She testified that originally she had leased the car from Ford, but at Ford's invitation had switched the lease to an installment purchase agreement. As evidenced by the installment sales contract attached to Ford's proof of claim, the parties entered into this contract on January 5, 1996. After applicable credits and fees were included, the debtor financed $17,297.15 for the purchase of her car, payable in 60 monthly installments of $442.39 each. The contract rate of interest was 17.9%. The debtor made her last payment to Ford by personal check on March 14, 1997, and, as noted above, filed her chapter 13 petition approximately two months later.

The debtor testified that the reason she filed her chapter 13 case because she was "having difficulty" making the car payments to Ford,[4] and that she had stopped making the car payments because she knew that she would incur major dental expenses in the future. She also testified that she will need hip replacement surgery sometime in the future, and although the procedure itself would be fully covered by her health insurance, the surgery would cause her to miss several months of work without pay. Although she testified that she did not have the money to pay Ford in April or May, evidence presented by Ford as to the balance in her checking account belies that assertion. Specifically, the debtor's monthly bank statements for the period from December 1996 through July 1997, together with a copy of her check register for the period from March 1997 through October 1997, reflect that the debtor never had a balance in her checking account of less than approximately $3,500, and that the balance at one point was as high as $5,100.[5] The debtor testified that she kept this amount in her checking account as a "safety net" and that this amount was all that separated her from financial destitution. The debtor's testimony was notably vague as to whether the follow-up chapter 13 filing had been planned at the time she originally filed her chapter 7 petition, but it seems a fair inference from the evidence that a "chapter 20" filing was envisioned from the outset, at least by the debtor's attorneys, as the strategy for reducing her car payment.

The debtor's schedule I ("Current Income") reflects that she is employed as a registered nurse by a nursing home and receives a monthly net income of $2,687.12. Her schedule J ("Current Expenditures") reflects that her monthly expenses are $1,804.00, leaving $883.12 as potentially available to pay her creditors. At the hearing, however, the debtor testified that she now is employed at a different nursing home making about $18.50 per hour, compared with $21.00 per hour at her prior employment.[6]

---

**3.** At the hearing, neither party offered evidence or argument on the question of an appropriate interest rate. However, it is clear that the appropriate rate of interest that should be provided in a chapter 13 plan to compensate the secured creditor for the delay in receiving the future payments is the rate that the secured creditor would otherwise be able to obtain in its lending market as of the time of confirmation of the plan. *United Carolina Bank v. Hall*, 993 F.2d 1126, 1130–31 (4th Cir.1993). This rate, however, would ordinarily be capped at the rate provided for by the contract. *Id.*

**4.** The debtor's check register reflects that she wrote check number 2407 to her bankruptcy attorney in the amount of $360 on May 19, 1997.

The transaction description is noted as "(ch # 13 Bank. for car)."

**5.** The debtor's schedule B ("Personal Property") represents that the debtor had only $100 in her checking account when she filed her chapter 13 petition. Her bank statement, however, reflects that she had a little over $4,000 in her account on that date.

**6.** Counsel for the debtor proffered that the debtor's income has been reduced by about $369.00 per month. Even assuming that is true, the debtor would still be left with about $514.12 in excess income, more than enough to pay the regular monthly payment of $442.39 owed Ford under the financing contract.

This reduction in income is not reflected in an amended schedule I, but counsel for the debtor offered to file such an amended schedule. The debtor further testified that in the past she frequently had to borrow money from her elderly parents in order to supplement her income, but has not done so for the "past few months." These borrowings are not reflected on her schedules.[7] No convincing explanation has been provided to the court, nor has the court been able to determine based on its own examination of the bank statements and checkbook register—which reflect no unusual expenses—why the debtor would not have been able to make the monthly payment of $442.39 to Ford in April and May 1997, when she had excess income of almost $900 per month, supplemented by amounts she received from her parents.

### Conclusions of Law and Discussion

#### A.

The issues before the court are (1) whether the debtor's use of chapter 7 followed by chapter 13—commonly referred to as a "chapter 20" filing—to accomplish a result that could not be achieved under either chapter alone violates the requirement of § 1325(a)(3), Bankruptcy Code, that a chapter 13 plan be "proposed in good faith and not by any means forbidden by law" and (2) whether the 9.44% interest rate satisfies the requirement of § 1325(a)(5)(B), Bankruptcy Code, that the present value of the payments to be made to Ford at least equal the amount of its secured claim. This court has jurisdiction of this controversy under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984. Under 28 U.S.C. § 157(b)(2)(L), this is a core proceeding in which final orders and judgments may be entered by a bankruptcy judge, subject to the right of appeal under 28 U.S.C. § 158.

#### B.

Ford does not argue that a chapter 13 filing after a chapter 7 discharge is *per se*

improper, and it concedes that the Supreme Court's opinion in *Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), while hardly a ringing endorsement of "chapter 20" filings, expressly held that chapter 13 relief was not "categorically" foreclosed to a debtor whose personal liability on secured obligations has been discharged in a prior chapter 7 case. *Id.* at 86, 111 S.Ct. at 2155–56. Ford does, however, read *Johnson* as holding that both the secured and unsecured components of an undersecured claim surviving a chapter 7 discharge must be recognized and paid in an ensuing chapter 13 case. A careful reading of *Johnson*, however, does not support that argument.

In *Johnson*, the issue was whether a debtor could include a mortgage lien in a chapter 13 plan once the personal liability of the debtor had been discharged in a chapter 7 case. *Id.* at 80, 111 S.Ct. at 2152. The Court held that the Bankruptcy Code's definition of "claim" was sufficiently broad to allow a debtor to include a bank's *in rem* claim against property of the debtor to be treated in a chapter 13 plan. *Id.* at 84, 111 S.Ct. at 2154. The court reasoned:

> [W]e have no trouble concluding that a mortgage interest that survives the discharge of a debtor's personal liability is a "claim" within the terms of § 101(5). Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor....
>
> [A] bankruptcy discharge extinguishes only one mode of enforcing a claim—name-

---

7. The debtor's check register reflects that two deposits were made to the debtor's checking account from money given to her by her father.

One was on June 2, 1997, in the amount of $300 and the other was on September 22, 1997, in the amount of $200.

ly, an action against the debtor in personam—while leaving intact another—namely, an action against the debtor in rem.

*Id.*, 111 S.Ct. at 2154. The Court found further support for its holding by turning to § 502(a)(1), which states that the court must allow a claim if it is enforceable against the debtor or property of the debtor. *Id.* at 85, 111 S.Ct. at 2154–55. Finally, the Court looked to the Code's rules of construction under § 102(2), which states that a " 'claim against the debtor' includes *'claims against property of the debtor.'* " *Id.*, 111 S.Ct. at 2155 (emphasis added). Nowhere does the opinion suggest, however, that an undersecured creditor's deficiency claim, for which the debtor no longer has personal liability, is allowable as a "claim" in a subsequent chapter 13 case.[8]

■ Under § 506(a), Bankruptcy Code, a claim is "secured" only to the extent of the value of the collateral. To the extent that the debt exceeds this amount, it is an unsecured claim. *Id.* Under § 506(d), a lien is void to the extent it secures a claim against the debtor that is not an allowed secured claim. Thus, at least under the reorganization chapters of the Bankruptcy Code—and putting aside the special election available in a chapter 11 case under § 1111(b), Bankruptcy Code—a claim enforceable only against property of the bankruptcy estate and not against the debtor personally is allowable only to the extent of the value of the collateral. *Johnson* indeed establishes that Ford has an *in rem* claim against the collateral that may be included within the debtor's chapter 13 plan. But nothing in *Johnson* suggests that § 506(d) would not apply in the chapter 13 case to limit that *in rem* claim to the value of the collateral. Accordingly, the

court concludes that Ford does not have an enforceable claim in this case for the unsecured portion of its claim. Ford's claim is secured by the debtor's automobile and under § 506(a), the amount of that claim is limited to the replacement cost of the collateral.

### C.

The court now turns to whether the debtor's plan satisfies the requirements for confirmation, and in particular, whether it has been proposed in good faith.

■ Under chapter 13 of the Bankruptcy Code, an individual may obtain an adjustment of his or her debts through a repayment plan. Section 1322, Bankruptcy Code, sets forth the provisions a chapter 13 plan may contain. Under § 1325(a), Bankruptcy Code, the court is required to ("shall") confirm a debtor's plan if certain requirements are satisfied. Among these is the requirement that "the plan has been proposed in good faith and not by any means forbidden by law." § 1325(a)(3), Bankruptcy Code. Whether a plan has been proposed "in good faith" is an "elastic" concept that requires a factual determination on a case-by-case basis. *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir.1982); *In re Hurdle*, 11 B.R. 304, 306 (Bankr.E.D.Va.1981) (Bostetter, C.J.); *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 858 (6th Cir.1988); *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 (9th Cir.1982); *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 431 (7th Cir.1982); *Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 352 (Bankr. 9th Cir. 1997). Such a determination cannot be made in a vacuum, but rather, the court must examine the practical effect of the

8. Ford's position is further weakened by reference to another portion of the Bankruptcy Code. What Ford is seeking to accomplish—establishing an unsecured deficiency claim for what has become (as a result of the chapter 7 discharge) a "non-recourse" obligation—is explicitly permitted in a chapter 11 case. Under § 1111(b)(1)(A), Bankruptcy Code, a creditor is deemed to have a unsecured deficiency claim for purposes of chapter 11 *whether or not the debt was recourse or non-recourse* outside of bankruptcy. Furthermore, under § 1111(b)(2), the secured creditor may elect to have its entire claim, including the unsecured portion, treated as fully secured. If

Congress had intended for an undersecured creditor to have the same right in chapter 13 as it has under § 1111(b)(1) in a chapter 11 case, it presumably would have said so. *See Field v. Mans*, 516 U.S. 59, 66–68, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion' ") *quoting Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983).

plan. *State Education Assistance Authority v. Johnson*, 43 B.R. 1016, 1022 (E.D.Va.1984) (Doumar, J.). The debtor has the burden of proof for establishing that the plan satisfies the good faith test. *In re Harrison*, 203 B.R. 253, 255 (Bankr.E.D.Va.1996) (Tice, J.); *Padilla*, 213 B.R. at 352. Although a payment plan proposed by a debtor should be a meaningful effort to repay creditors, what is a "meaningful repayment" will vary depending on the circumstances. *Hurdle*, 11 B.R. at 306.

In *Deans v. O'Donnell*, 692 F.2d 968 (4th Cir.1982), the Fourth Circuit rejected the argument that a zero percent plan was *per se* proposed in bad faith or that the Bankruptcy Code imposed a requirement of "substantial" repayment in chapter 13 cases. The Court held, rather, that while the percentage of repayment was a relevant consideration, "the totality of circumstances must be examined on a case by case basis" in determining whether a chapter 13 plan meets the good faith standard of § 1325(a)(3). *Id.* at 972. The *Deans* opinion sets forth a suggested and non-inclusive list of factors to be considered.[9] These are as follows:

1. The percentage of proposed repayment.
2. The debtor's financial situation.
3. The period of time payment will be made.
4. The debtor's employment history and prospects.
5. The nature and amount of unsecured claims.
6. The debtor's past bankruptcy filings.

7. The debtor's honesty in representing facts.
8. Any unusual or exceptional problems facing the debtor.

*Id.*

However, this court, unlike the Fourth Circuit in *Deans*, is not confronted with a "straight" chapter 13 case, but rather with the chapter 13 component of a "chapter 20" case—that is, a chapter 13 case brought while the ink on the debtor's chapter 7 discharge is just barely dry.[10] While it is clear that chapter 20's are not prohibited *per se*,[11] such cases are not favored and must be closely scrutinized. *Downey Savings and Loan Association v. Metz (In re Metz)*, 67 B.R. 462, 466 (Bankr. 9th Cir. 1986), *aff'd*, 820 F.2d 1495 (9th Cir.1987); *Gelletich v. Household Realty Corp. (In re Gelletich)*, 167 B.R. 370, 378–79 (Bankr.E.D.Pa.1994); *In re Sunderland*, 157 B.R. 39, 41–43 (Bankr. M.D.Fla.1993); *In re Warner*, 115 B.R. 233, 245 (Bankr.C.D.Cal.1989). Courts have recognized that a debtor who goes through the chapter 20 process can thereby potentially obtain the benefits of both chapter 7 and chapter 13 while circumventing at least some of their burdens. *Metz*, 67 B.R. at 465; *Sunderland*, 157 B.R. at 41–42. For example, assuming that the debtor has property with little or only modest equity, he or she can discharge all unsecured debt while utilizing any available exemptions to exempt any equity in the property. Then, once the debtor files under chapter 13, he or she can obtain the benefits of the so-called "super-discharge" provided for by § 1328(a), remain in control of property of the estate, reorga-

---

**9.** These factors were supplemented in *Neufeld v. Freeman*, 794 F.2d 149 (4th Cir.1986), to add an inquiry into whether a major portion of the claims sought to be discharged arises out of prepetition fraud or other wrongful conduct and the debtor proposes only minimal repayment of those claims; and whether, despite even the most egregious pre-filing conduct, the plan nevertheless represents a good faith effort by the debtor to satisfy creditors' claims. *Id.* at 152–153. Neither of these inquiries is relevant to the present case.

**10.** There are numerous reasons why a debtor would want to file a chapter 20. For example, there are the perfectly legitimate reasons such as that the debtor may be over the chapter 13 jurisdictional limit of $250,000 of liquidated, non-contingent unsecured debt, or that the debt-

or does not have the disposable income to make a chapter 13 plan feasible without first discharging some debts in order to free up an amount to contribute to the plan. Or, there are the more suspect reasons that the debtor desires to reduce the amount of commission being paid a chapter 13 trustee due to less debts being paid through the plan or to minimize the amount of unsecured debt so that the debtor could make minimal payments on unsecured debt while still paying off unsecured creditors in full or without contributing all disposable income to the plan for its duration. *See* 2 David G. Epstein et al., Bankruptcy § 9–30, at 710–11 (1992).

**11.** *Johnson v. Home State Bank*, 501 U.S. 78, 87, 111 S.Ct. 2150, 2156, 115 L.Ed.2d 66 (1991); *In re Thorsted*, 157 B.R. 5, 10 (Bankr.E.D.Va.1993) (Shelley, J.).

nize secured debt in default, and sidestep the requirement imposed under § 1325(b) that the debtor either pay all unsecured creditors in full, or contribute all disposable income to the plan for at least 36 months. *Metz,* 67 B.R. at 465; *Sunderland,* 157 B.R. at 41–42. In effect, the chapter 20 then becomes a chapter 13 which provides a 0% dividend to unsecured creditors. *Metz,* 67 B.R. at 465; *Sunderland,* 157 B.R. at 42. Such a tactic nullifies the purpose and incentive underlying chapter 13, which is to encourage the meaningful payment of unsecured debt by rewarding the debtor with the super-discharge and the ability to remain in control of property of the estate. *Metz,* 67 B.R. at 466.

■ Accordingly, in addition to the non-exclusive and representative factors enunciated in *Deans* and supplemented by *Neufeld,* this court would look to the following factors in a chapter 20 context for determining whether a chapter 13 plan has been proposed in good faith:

1. The proximity in time of the chapter 13 filing to the chapter 7 filing.[12]

2. Whether the debtor has incurred some change in circumstances between the filings that suggests a second filing was appropriate and that the debtor will be able to comply with the terms of a chapter 13 plan.[13]

3. Whether the two filings accomplish a result that is not permitted in either chapter standing alone.[14]

4. Whether the two filings treat creditors in a fundamentally fair and equitable manner or whether they are rather an attempt to manipulate the bankruptcy system or are an abuse of the purpose and spirit of the Bankruptcy Code.[15]

■ Turning to the present case, this court simply cannot find that the present plan has been proposed in good faith. Even limiting an inquiry to the *Deans* factors, many of them cut against the debtor in finding that the present plan was proposed in good faith. The percentage repayment to unsecured creditors is zero percent, since all of the unsecured liabilities were discharged in the debtor's chapter 7 case. While the debtor testified that she was having difficulties making the car payments and that she had to occasionally borrow money from her parents, her schedules of income and expenses show a significant disposable income and this court is simply perplexed why the debtor was continuing to suffer financial hardship when she was relieved of the bur-

12. *See In re Hundley,* 99 B.R. 306, 309 (Bankr. E.D.Va.1989) (Shelley, J.); *Ravenot v. Rimgale* (*In re Rimgale* ), 669 F.2d 426, 432–33 n. 22 (7th Cir., 1982).

13. *See Downey Savings and Loan Association v. Metz* (*In re Metz* ), 820 F.2d 1495, 1498 (9th Cir.1987); *Smyrnos v. Padilla* (*In re Padilla* ), 213 B.R. 349, 354 (Bankr.9th Cir.1997); *In re Warner,* 115 B.R. 233, 245 (Bankr.C.D.Cal.1989).

14. *See State Education Assistance Authority v. Johnson,* 43 B.R. 1016, 1022 (E.D.Va.1984) (Doumar, J.) (Reasoning that the court must look to the purpose of the filing to determine if the good faith test is met in proposing a chapter 13 plan); *Metz,* 820 F.2d at 1497 (noting that the debtor's "successive filings may be examined together and the result achieved by such filings reviewed against the statutory requirements.") citing *Neufeld v. Freeman,* 794 F.2d 149 (4th Cir.1986); *Downey Savings and Loan Association v. Metz* (*In re Metz* ), 67 B.R. 462, 466 (9th Cir. BAP 1986) (noting that case-by-case inquiries are the appropriate vehicle for curbing "improper manipulations" of the Code), *aff'd,* 820 F.2d 1495 (9th Cir.1987); *Warner,* 115 B.R. at 245 ("The purpose of the 'chapter 20' filing must be

tested against the permissible objectives of chapter 13 plans".).

15. *See Deans,* 692 F.2d at 972; *Johnson,* 43 B.R. at 1022; *In re Harrison,* 203 B.R. 253, 255 (Bankr.E.D.Va.1996) (Tice, J.); *Hundley,* 99 B.R. at 309; *In re McAloon,* 44 B.R. 831, 835 (Bankr. E.D.Va.1984) (Shelley, J.); *In re Hurdle,* 11 B.R. 304, 306 (Bankr.E.D.Va.1981) (Bostetter, C.J.); *In re Seely,* 6 B.R. 309, 313 (Bankr.E.D.Va.1980) (Bonney, J.) (Good faith "is lacking when a debtor attempts to manipulate the statutory scheme for his own benefit at the expense of his creditors under the guise of a reorganization proceeding."); *see also Gier v. Farmers State Bank* (*In re Gier* ), 986 F.2d 1326, 1328 (10th Cir.1993); *Hardin v. Caldwell* (*In re Caldwell* ), 851 F.2d 852, 858–59 (6th Cir.1988); *Goeb v. Heid* (*In re Goeb* ), 675 F.2d 1386, 1390 (9th Cir.1982); *Ravenot v. Rimgale* (*In re Rimgale* ), 669 F.2d 426, 432–33 (7th Cir., 1982); *Warner,* 115 B.R. at 245; *In re Chase,* 43 B.R. 739, 745 (D.Md.1984) ("[T]he 'good faith' requirement has long been the policing mechanism of bankruptcy courts to assure that those who invoke the reorganization provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy philosophy and policy and for no other purpose.").

den of most of her debts as a result of her chapter 7 discharge. Additionally, the debtor is proposing to pay back Ford over 48 months, but her schedules indicate that with her disposable income, she could pay back Ford over a much shorter time period, and accordingly, no "cause" has been established for extending the term of the plan beyond the ordinary maximum period of 36 months. While the debtor testified that she just began a new job, she is a registered nurse and there is no indication that her future employment would be anything but stable. The only "unusual problems" that the debtor will face in the near future is significant dental and medical treatment, which, although largely covered by her health insurance, may cause her to miss a substantial period of work without pay. Finally, the court notes that the debtor's honesty in representing facts is questionable since she omitted from her schedules the small amount that her parents give to her to supplement her income and substantially understated the balance in her checking account.

Most troubling to the court, however, is that the debtor is attempting to accomplish through a chapter 20 what simply is not permitted in either chapter standing alone. In the chapter 13 case, she is "stripping"

Ford's lien down to the replacement cost of the car, which is not permitted in a chapter 7 under the Supreme Court's holding in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Additionally, while § 722, Bankruptcy Code, would have allowed the debtor in her chapter 7 case to redeem the car from Ford's security interest by paying Ford the value of the automobile or the amount of the allowed secured claim, whichever were less, § 722 contemplates that the debtor will make a lump sum payment [16] and does not permit redemption by means of installment payments over time.[17] It is clear to the court that the reason the debtor maintained the regular payments to Ford during the pendency of her chapter 7 was because controlling Fourth Circuit law allows her, where the payments on a secured debt are not in default, to retain the collateral without redeeming it or reaffirming the debt.[18] But it would also appear that the debtor never intended to maintain the payments any longer than was necessary to get her chapter 7 discharge, and that all along her intention was to use chapter 13 to redeem the collateral by paying Ford the replacement value of the car over time. In the chapter 7, she discharged all of her unsecured debt—including her personal liability to Ford on its po-

**16.** *See* 6 Collier on Bankruptcy ¶ 722.05[2], at 722–11 to 12 (Lawrence P. King, ed., 15th ed. rev.1997).

**17.** It could be argued that the Fourth Circuit's holding in *Home Owners Funding Corp. of Am. v. Belanger (In re Belanger)*, 962 F.2d 345, 348–49 (4th Cir.1992) effectively allows the equivalent of redemption over time. In *Belanger*, the Court held that a debtor who was current on his or her payments on a secured obligation could retain the collateral without having either to redeem the collateral or to reaffirm the debt. But there is a fundamental difference between redemption under § 722 and merely continuing to make payments under *Belanger*. When property is redeemed, the creditor gets at most the value of its collateral. But where the debtor takes advantage of the holding in *Belanger* to retain the collateral without redeeming or reaffirming, he or she must pay the full amount of the debt, and not simply the value of the collateral. If the debtor defaults, the creditor may enforce its lien by repossessing and selling the collateral. While the opinion in *Belanger* recognized that a creditor can be put at risk where collateral (there, a mobile home) was of a highly depreciable nature, the court noted that the creditor was no more at risk than any other lender under an installment contract and could protect itself by structuring

the contract properly (for example, charging an interest rate commensurate with the risk). *Id.* at 348–49.

**18.** *Belanger*, 962 F.2d at 348–49; *see also Riggs Nat'l Bank v. Perry*, 729 F.2d 982 (4th Cir.1984) (secured creditor not entitled to relief from stay where debtor continued to make required payments; default on filing clause unenforceable.) At least two other circuits concur. *Capital Communications Fed. Credit Union v. Boodrow*, 126 F.3d 43 (2nd Cir.1997); *Lowry Fed. Credit Union v.. West*, 882 F.2d 1543 (10th Cir.1989). Other circuits, however, disagree. *In re Johnson*, 89 F.3d 249 (5th Cir.1996) (no retention of collateral without reaffirmation or redemption); *In re Taylor*, 3 F.3d 1512 (11th Cir.1993); *In re Edwards*, 901 F.2d 1383 (7th Cir.1990); *In re Bell*, 700 F.2d 1053 (6th Cir.1983). The National Bankruptcy Review Commission, while not taking a position on how the current Bankruptcy Code provisions should be interpreted, has recommended on policy grounds that the so-called "ride-through" of secured consumer debts allowed by *Belanger* be eliminated. Report of the Nat'l Bankr.Rev. Comm. § 1.3.3, p. 165–169 (1997).

tential deficiency claim—and in the chapter 13 she is proposing to pay no dividend to unsecured creditors because none now exist. Had she not discharged her unsecured debt in the chapter 7, a 0% plan in chapter 13 would be at least suspect and a factor to be weighed in the *Deans* analysis. In addition, a 0% plan would not have been permitted under § 1325(b), Bankruptcy Code, since the debtor's schedules reflect significant disposable income that is not being committed to the plan. Finally, the debtor has not shown any significant change in circumstances that would warrant her need for the protections afforded by chapter 13 following her chapter 7 discharge. The debtor's disposable income, after necessary living expenses, is *double* her monthly installment payment to Ford and she has not shown any reason (other than the expectation, not yet materialized, of future medical expenses) why she cannot make the regular payment. Simply stated, treating the debtor's two bankruptcies as one in substance, the debtor's proposed plan would permit her to accomplish a result not permitted in either chapter 7 or 13 standing alone and would allow her to manipulate the system in a way that abuses the purpose and spirit of the Bankruptcy Code in order to retain her car while treating Ford in a patently unfair manner.[19] Accordingly, the court will deny confirmation of the debtor's June 3, 1997, plan as not having been proposed in good faith.[20]

### D.

A separate order will be entered consistent with this opinion.

---

**19.** The court notes that the element of unfairness present here is absent when a creditor is secured only by the debtor's principal residence. Under the Supreme Court's holding in *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), a debtor is prohibited under § 1322(b)(2), Bankruptcy Code, from modifying the rights of a holder of such a security interest. Accordingly, the full amount of such creditor's claim would have to be paid even where the house is worth less than the amount of the debt and the debtor's personal liability has been discharged in a prior chapter 7.

**20.** Because the court finds that the plan is unconfirmable under § 1325(a)(3), the court need not reach Ford's objection to the interest rate. In the absence of evidence to the contrary, however, the court would be inclined to find the contract rate of interest to be the most persuasive evidence of the market rate of interest for a loan of like terms and risk, particularly where only a relatively short period of time had elapsed between the making of the loan and the filing of the chapter 13 petition.