In re Laurette M. TAYLOR, Debtor.

In re William J. Taylor, Debtor.

In re Laurette M. Taylor, Debtor.

Nos. 00–13529–RGM, 00–13532–RGM, 00–12201–RGM.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 30, 2001.

David E. Jones, Fairfax, VA, for debtor.

Robert O. Tyler, Tyler, Bartl, Burke & Gorman PLC, Alexandria, VA, trustee.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

The cases before the court initially appear to present "chapter 20" issues that have been addressed in many other cases. Upon closer scrutiny, however, the matters become somewhat more complicated and raise the issue of the appropriate remedy where the chapter 13 case is found to have been improperly filed.

### Prior Bankruptcy Filings

William J. Taylor and Laurette M. Taylor filed a voluntary joint petition in bankruptcy pursuant to chapter 7 of the Bankruptcy Code in this court on February 18, 1992. The trustee filed a report stating that there were no assets available for distribution to creditors. The debtors were granted a discharge on June 10, 1992, and the case was closed on July 20, 1992.

In less than two years, on June 20, 1994, William J. Taylor filed a voluntary petition in bankruptcy pursuant to chapter 11 of the Bankruptcy Code in this court (the "chapter 11 case"). After several failed attempts, the debtor's Third Amended Plan was confirmed on July 1, 1997. A Final Decree was entered on December 16, 1997, and the case was closed. Chrysler Financial Corporation filed a motion for relief from stay on February 5, 1998,[1] and on December 15, 1998, the case was re-

1. The facts concerning the 1992 chapter 7 case and the 1994 chapter 11 case are taken from the court's docket. The case files were sent to archives and were not retrieved for the

hearing. Consequently, in the chapter 11 case, it is not known what the terms of the debtor's confirmed plan were, the stay that

opened. It was again closed on February 3, 1999. On November 12, 1999. George F. Guillette and John Guillette filed a motion for relief from stay which was disposed of on January 19, 2000, by entry of an order granting the motion. The docket does not contain a separate entry reflecting that a discharge was granted. In fact, the debtor was ineligible for a discharge in the chapter 11 case because he had received a discharge in his prior chapter 7 case which had been filed within six years of the chapter 11 case. *See* 11 U.S.C. §§ 727(a)(8) and 1141(d)(3)(C).

The third bankruptcy case, a voluntary joint petition filed pursuant to chapter 7, was filed on May 18, 2000, by Mr. and Mrs. Taylor ("Mrs. Taylor's chapter 7 case"). This was 34 days shy of the six-year period commencing on the filing date of Mr. Taylor's chapter 11 case. On July 5, 2000, Mr. Taylor requested that the chapter 7 petition be dismissed as to him because he was ineligible for a chapter 7 discharge, asserting that he had received a discharge in the chapter 11 case filed on June 20, 1994. The motion was granted and the chapter 7 case was dismissed as to Mr. Taylor. The chapter 7 trustee filed his report on July 27, 2000, stating that there were no assets available for distribution to unsecured creditors. Mrs. Taylor was granted her chapter 7 discharge on August 17, 2000. On September 7, 2000, the case was closed.

In addition to these prior personal bankruptcy filings, W.J. Taylor Construction, Incorporated, which is owned by William J. Taylor, filed a voluntary chapter 11 petition in this court on July 10, 2000. The case was converted to a proceeding under chapter 7 on December 14, 2000.

Mr. Taylor failed to attend the first meeting of creditors in the converted case. Pursuant to Local Bankruptcy Rule 1017–3, a show cause order was issued against Mr. Taylor. The first meeting was rescheduled for April 19, 2001. The case remains open.

### *Mrs. Taylor's Present Chapter 13 Case and Mr. Taylor's Chapter 7 Case*

Seven days after Mrs. Taylor was granted her second chapter 7 discharge and while her chapter 7 case was still pending, she filed her third petition, a chapter 13 case which is before the court ("Mrs. Taylor's chapter 13 case"). On that same day, August 24, 2000. Mr. Taylor filed a voluntary chapter 7 petition ("Mr. Taylor's chapter 7 case"). Mr. Taylor's chapter 7 case proceeded as a routine no-asset case. The trustee filed a no distribution report on October 12, 2000. Mr. Taylor was granted a discharge on December 7, 2000. The case was closed on January 5, 2001.

■ Mrs. Taylor's chapter 13 case, which is now before the court, has not proceeded well despite the fact that she scheduled only two creditors, both secured. The first was Ocwen Federal Bank FSB ("Ocwen"). She scheduled the secured debt at $247,079.00, and the property secured by the debt—the Taylors' home—with a value of $285,000.00. She also stated that the property was owned by her husband and herself as tenants by the entireties, but only claimed an exemption of $8,000.00 under the Virginia Homestead Act, Va.Code § 34–4.[2] Ocwen filed a proof of claim on September 22, 2000, asserting a total indebtedness of $255,653.72, of which $24,737.69 was in arrears. The proof of claim did not value the collateral.

---

the movant sought to lift or the necessary for the motion.

**2.** The homestead exemption is subject to a lifetime limit of $5,000.00 plus $500.00 per dependent. Mrs. Taylor may have exhausted her homestead exemption in her prior cases.

It stated that the monthly payments were $2,914.05. Copies of the note and deed of trust were attached to the proof of claim. The note was dated February 22, 1996, and was made solely by Mrs. Taylor.[3] Both Mr. and Mrs. Taylor executed the deed of trust.

The second secured creditor scheduled by Mrs. Taylor in her chapter 13 case was General Motors Acceptance Corporation ("GMAC"). GMAC's claim is secured by a 1996 GMC pick-up truck which Mrs. Taylor valued at $8,000.00. She scheduled the total debt as $10,000.00, asserting that GMAC was unsecured to the extent of $2,000.00. GMAC filed a proof of claim on September 18, 2000, asserting a total debt in the amount of $15,746.00. The proof of claim stated that there was no arrearage on the filing date and that the collateral was worth $14,800.00.

Mrs. Taylor filed three chapter 13 plans in this case. The first chapter 13 plan proposed to cure Ocwen's pre-petition arrearage over 60 months without interest and to pay GMAC the secured portion of its claim over 60 months with interest at the rate of 12% per annum. The unsecured portion was proposed to be compromised, with 20% of the unsecured amount to be paid over 60 months. Both the chapter 13 trustee and GMAC objected to confirmation of the plan. The trustee asserted that the debtor had failed to cooperate with him by failing to provide a copy of Mr. Taylor's restitution order and chapter 11 information. GMAC asserted that the value of the vehicle was $14,800.00 and that the proposed interest rate was less than the contract rate of 14.75% Confirmation of the plan was denied.

Mrs. Taylor's second chapter 13 plan facially appeared to have cured GMAC's objections. A compromise was reached on the value of the vehicle, $13,475.00, and the interest rate was increased to the contract rate. The plan, however, proposed to pay nothing on the unsecured portion of GMAC's loan, presumably because the debt had previously been discharged in both Mr. Taylor and Mrs. Taylor's chapter 7 cases. The second plan would have resulted in additional interest of $1,597.00 to GMAC. However, the deletion of the payment on the unsecured portion of its debt resulted in a loss of $1,098.00.[4] The net effect of the additional interest, the increased valuation of the vehicle and the deletion of the unsecured payment was to pay GMAC $227.00 more than in the first plan. GMAC objected. It asserted that the vehicle was a corporate asset, not an individual, that Mrs. Taylor's budget reflected payments for the benefit of her husband and that 60 months was an unreasonably long payment period. The second plan was denied confirmation.[5]

Mrs. Taylor filed her third chapter 13 plan on January 30, 2001. The third plan proposed the plan period from 60 months to 36 months. However, it did not propose to pay any portion GMAC's unsecured claim. In addition, it proposed to sell the residence and pay-off Ocwen the sales price. With regard to the sale of the house, the plan stated only that:

> Debtor has listed house for sale. Net proceeds from sale should pay Ocwen claim, principal and arrearage, in full.

---

**3.** Mr. Taylor's chapter 11 case was then pending and his chapter 11 plan had not been confirmed.

**4.** The loss could have been as high as $1,549.20 or as low as $189.20 depending on how one interprets the two proposed plans.

**5.** The Internal Revenue Service, which was not listed as a creditor, filed a proof of claim and objected to both the second and third plans. The IRS ultimately withdrew its proof of claim.

House valued on petition at $285,000 and Ocwen claim at $247,000.

Third Amended Chapter 13 Plan. ¶ B–5(a). No deadlines or other safeguards were proposed to assure that the house would be promptly marketed.[6] Both the chapter 13 trustee and GMAC objected to the third plan. The chapter 13 trustee asserted that the plan modified the rights of Ocwen, a creditor secured by the debtor's principal residence, in violation of § 1322(b)(2), and was not feasible because it did not fully pay filed claims in violation of § 1325(a)(6). GMAC asserted the same grounds as it had asserted to the second plan and, in addition, asserted that no payments had been received since May 1, 2000. It also raised for the first time the question of whether the case was filed in good faith. The chapter 13 trustee also moved to dismiss the case on the ground of unreasonable delay prejudicial to the rights of the creditors. See 11 U.S.C. § 1307(c)(1). Meanwhile, Ocwen filed a motion seeking relief from the automatic stay imposed by § 362.

Matters began to come to a head on April 4, 2001. The objections to confirmation of the third plan, the chapter 13 trustee's motion to dismiss and Ocwen's motion for relief from the automatic stay were scheduled to be heard that day. When the case was called, debtor's counsel, announced that the relief from stay motion had been settled and that an order would be circulated and submitted. He also stated that he had provided the chapter 13 trustee with the listing agreement and other information sought in connection with the trustee's evaluation of the sale of the property. Counsel[7] represented that an offer for the house was imminent and that the anticipated sales price of $345,000 would be more than adequate to pay Ocwen in full. The trustee reported that he has seen a copy of the listing, which was dated October 2000, and that the listing price was $345,000. Mrs. Taylor's chapter 13 schedules, which were signed on August 22, 2000, scheduled the value of the property at $285,000, as had the schedules in the preceding two chapter 7 cases in which the chapter 7 trustees had filed no distribution reports. The proposed third chapter 13 plan, which was dated January 29, 2001, referred to the value of the house as $285,000.00.

The court, sua sponte, issued an order to show cause why Mrs. Taylor's chapter 13 case ought not be converted to a proceeding under chapter 7 and why the two preceding chapter 7 cases ought not be reopened and consolidated into the present chapter 13 case. The order to show cause was set for hearing on April 18, 2001. All other matters were continued to the same date.

### Valuation of Residence

The debtors scheduled the real property known as 12756 Bren Forest Way, Manassas, Virginia in all three cases filed in 2000. In each case, they stated that the fair market value of the property, without deduction of any secured claim or exemption,

---

6. The present residential real estate market is very favorable to sellers. During the last 24 months, properties have sold promptly at or near the full listing price, assuming a properly priced property. There are reports of properties selling on the day they are placed on the market and of buyers paying more than the listing price.

7. Counsel in this case represented Mr. and Mrs. Taylor in all of their prior cases except the 1992 case. Counsel also represents W.J. Taylor Construction. Incorporated in its bankruptcy. Counsel has filed a motion to withdraw as counsel in Mrs. Taylor's chapter 13 case and Mr. Taylor's chapter 7 case, asserting that the Taylors may have a malpractice claim against him.

was $285,000.00. They further stated that the property was owned by them as tenants by the entirety and was subject to a secured claim of Ocwen in the total amount of $247,079.00.

Debtor's counsel and the chapter 13 trustee each made proffers of the proposed testimony of the real estate agent who had listed the property.[8] Although conflicting on one point, there were no objections to the proffers. The trustee proffered that a copy of the real estate listing had been provided to him. It was dated October 27, 2000, and reflected a listing price of $345,000.00. The listing expired in January 2001. Mrs. Taylor renewed it although Mr. Taylor did not execute the renewal. The real estate agent told the chapter 13 trustee that the property would probably sell for close to the listing price. Debtor's counsel proffered that the real estate agent would testify that he did not expect the property to sell for the listing price, but rather for $305,000.00.

Only Mrs. Taylor testified at the April 18, 2001, hearing. She testified that she received an offer for $305,000.00 which was not acceptable because the purchasers wanted the Taylors to hold a note secured by a second trust on the property in the amount of $60,000.00. She also stated that the value of the property was less than $345,000.00 because the carpet in the lower level of the house had been ruined by a flood a year earlier and had mildewed. She has been unable to replace the carpet and remediate the mildew problem because neither she nor her husband had the financial ability to do so. She estimated the size of the carpet in relationship to the courtroom. She further testified that the Prince William County real estate tax assessment for 2001 was $298,000.00.

Ocwen filed a proof of claim asserting a balance due of $255.653.72, which Mrs. Taylor agreed was approximately correct. The house has been marketed since October 2000. In preparing her schedules, she relied on the Prince William County tax assessment and did not believe that her home was worth more than the tax assessment until October 2000, when she signed the listing agreement. She did not explain what occurred to change her opinion of the value of the property between October 2000, when she listed the property at $345,000.00, and April 18, 2001, when she testified to the $305,000.00 value.

### Legal Standards for "Chapter 20" Case Filings

■ The question of whether a debtor may file, sequentially, a chapter 7 petition and then chapter 13 petition (the so-called "chapter 20") has been settled for a decade. The Supreme Court held that "Congress did not intend categorically to foreclose the benefit of Chapter 13 reorganization to a debtor who previously has filed for Chapter 7 relief." *Johnson v. Home State Bank*, 501 U.S. 78, 87, 111 S.Ct. 2150, 2156, 115 L.Ed.2d 66 (1991). This does not mean that every chapter 20 sequence is appropriate. The Supreme Court noted the good faith requirement, the liquidation test, the feasibility test and the protections for secured creditors. It then stated:

> In addition, the bankruptcy court retains its broad equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code.]' § 105(a). Any or all of these provisions may be impli-

---

8. The real estate agent was unavailable due to health matters. The trustee and debtor's counsel had both separately interviewed him.

cated when a debtor files serially under Chapter 7 and Chapter 13.

*Johnson,* 501 U.S. at 88, 111 S.Ct. at 2156.

■ The good faith requirement in "chapter 20" filings has been addressed in prior cases in this district. *See In re Craig,* 222 B.R. 266 (Bankr.E.D.Va., 1998) (Bostetter, C.J.); *In re Cushman,* 217 B.R. 470 (Bankr.E.D.Va., 1998) (Mitchell, J.). It is not necessary to restate the thorough analysis of these two cases. Suffice it to say that a "chapter 20" ordinarily ought not be permitted when the debtor improperly seeks to accomplish indirectly through sequential filings, first under chapter 7 and then chapter 13, that which he cannot achieve directly under either chapter. The determination of which sequential filings are proper is assisted by the non-exclusive factors set forth in *Deans v. O'Donnell,* 692 F.2d 968, 972 (4th Cir., 1982), as expanded in *Neufeld v. Freeman (In re Freeman)* 794 F.2d 149, 152 (4th Cir., 1986), and by the four additional non-exclusive factors first enunciated in *Cushman.*[9] The *Deans* factors are:

1. The percentage of the proposed repayment.

2. The debtor's financial situation.

3. The period of time payment will be made.

4. The debtor's employment history and prospects.

5. The nature and amount of unsecured claims.

6. The debtor's past bankruptcy filings.

7. The debtor's honesty in representing facts.

8. Any unusual or exceptional problems facing the debtor.

*Deans,* 692 F.2d at 972.

■ The additional *Neufeld* factors are:

1. Whether a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct and whether the chapter 13 plan proposes to repay only a minimal portion of those claims.

2. Whether, despite even egregious pre-filing conduct, the plan represents a good faith effort to satisfy creditors' claims.

*Neufeld,* 794 F.2d at 152–53; *Cushman,* 217 B.R. at 476 n. 9.

■ The *Cushman* factors are:

1. The proximity in time of the chapter 13 filing to the chapter 7 filing.

2. Whether the debtor has incurred some change in circumstances between the filings that suggests a second filing was appropriate and that the debtor will be able to comply with the terms of a chapter 13 plan.

3. Whether the two filings accomplish a result that is not permitted in either chapter standing alone.

4. Whether the two filings treat creditors in a fundamentally fair and equitable manner or whether they are rather an attempt to manipulate the bankruptcy system or are an abuse of the purpose and spirit of the Bankruptcy Code.

*Cushman,* 217 B.R. at 477.

■ The analysis, as guided by the

---

**9.** *Deans* was not a "chapter 20" case. The debtor had not previously filed bankruptcy. The issue was whether nominal payment plans were *per se* improper under chapter 13. In *Neufeld,* the debtor had previously obtained a chapter 13 discharge and had filed a second chapter 13 case. *Neufeld* is more closely related to "chapter 20" than *Deans.* Nonetheless, all the factors relate to good faith, which is the central factor in the "chapter 20" analysis.

foregoing factors,[10] is designed to distinguish between the proper and the improper resort to "chapter 20." *See In re Waters* 227 B.R. 784, 786 (Bankr.W.D.Va., 1998) (Anderson, J.). The debtor bears the burden of proof for confirmation, including his good faith. *Craig*, 222 B.R. at 270; *Cushman*, 217 B.R. at 476. Here, the debtor's absence of good faith is manifest.

### Discussion

### Timing of Filings and Change in Circumstances Between Filings

■■■■ Mrs. Taylor's chapter 13 case was filed seven days after she received her chapter 7 discharge and while her chapter 7 case was still open. No mortgage payments or truck payments were made while the chapter 7 case was pending. There was no change in income, and, except as discusses below, no material change in expenses between May 18, 2000, when the joint chapter 7 case was filed, and August 24, 2000, when Mrs. Taylor's chapter 13 case and Mr. Taylor's chapter 7 case were filed. There is no explanation of why postpetition mortgage payments and truck payments were not made during the chapter 7 proceeding. If it was from lack of income, the chapter 13 plan would not be feasible. If there was sufficient income, the disposition of the income that should have gone to mortgage payments and truck payments while the chapter 7 was pending but did not, has not been explained. There was no change in the circumstances of either Mrs. Taylor or Mr.

Taylor between the date of her two filings. While relief from the automatic stay was granted to GMAC on August 1, 2000, and to Ocwen on August 3, 2000, there is no reason why Mrs. Taylor's chapter 7 case could not have been originally filed as a chapter 13 case or, at least, converted to a chapter 13 case.

### The Debtor's Candor

There was no change in the income of either Mr. or Mrs. Taylor from the first chapter 7 petition to the present. The income statements (Schedule I) are identical in Mrs. Taylor's chapter 7 case (which was initially a joint filing) and in Mrs. Taylor's chapter 13 case.[11] They show net income after deductions of $8,208.00 per month. Mrs. Taylor's net take home pay per month is $2,108.00 and Mr. Taylor's is $6,100.00. Mrs. Taylor has been employed as a secretary at an insurance company for 21 years. Mr. Taylor has been a self-employed contractor for four years.

The expenses reflected on Schedule J in all three cases are identical except that three expenses were reduced on Schedule J in Mrs. Taylor's chapter 13 case: Electricity and heating fuel is reduced from $350.00 to $250.00; Food is reduced from $500.00 to $450.00; and Life insurance premiums are reduced from $350.00 to $100.00. Total expenses are reduced from $8,112.00 to $7,712.00 per month. Rather than having a surplus of $96.00 per month as scheduled in both Taylor's and Mrs. Taylor's chapter 7 petitions, the chapter 13 surplus is $496.00 per month. It should be noted that Schedule J in Mr. Taylor's

---

**10.** "[T]he totality of circumstance must be examined on a case by case basis." *Deans*, 692 F.2d at 972.

**11.** The court is unable to find Schedule I in Mr. Taylor's chapter 7 case. However, since the remaining schedules are almost identical in all three cases and because the Schedule

I's filed in Mrs. Taylor's chapter 7 and chapter 13 cases are identical, the court will presume that the Schedule I in Mr. Taylor's chapter 7 case, which was filed on the same day as Mrs. Taylor's chapter 13 case, is identical to the other two Schedule I's.

chapter 7 case, which was filed the same day as Mrs. Taylor's chapter 13 case, did not reflect the reduced expenses. It continued to reflect, as had, the joint petition filed in May 2000, a monthly surplus of $96.00. Moreover, Mrs. Taylor's first chapter 13 plan proposed monthly trustee payments of $794.50; the second chapter 13 plan, $823.50; and the third chapter 13 plan, $525.00. The truck payment of $423.00 listed on Schedule J is part of the chapter 13 plan. Mrs. Taylor, therefore, really had $919.00 per month available to fund each of her three chapter 13 plans.

Schedule J in Mrs. Taylor's chapter 13 case reflects expenses of $1,949.00 that are obligations of her husband. They are $300.00 for his 1986 and 1987 income taxes, $423.00 for his truck, $226.00 for his chapter 11 plan payments,[12] and $1,000.00 for his restitution payment. There is an expense of $850.00 for their two daughters' school tuition. The mortgage payment is listed as $2,630.00 but is claimed at $2,914.50 on Ocwen's proof of claim.

Mrs. Taylor's chapter 13 schedules do not list Sears. She partially reaffirmed an obligation to Sears on June 16, 2000, in her chapter 7 case. While it may have been paid between June 16, 2000, and August 24, 2000, when she filed her chapter 13 petition, the record does not explain its absence in the chapter 13 case.

The debtor has not explained the differences in the valuation of the Taylors' home. The listing agreement of October 27, 2000, offered the home for sale at $345,000.00. Mrs. Taylor's April 18, 2001, testimony was $305,000.00. The value listed on the schedules filed on June 5, 2000, and August 24, 2000, was $285,000.00. The cost to replace the carpet and remedy the mildew problem is less than $5,000.00. This expense cannot by itself explain the difference in the value of the property from $345,000.00 to $305,000.00, as suggested by Mrs. Taylor. In any event, it was known to Mrs. Taylor and the real estate agent in October 2000 when the property was listed for sale. It is clear that the property, in its present condition, is worth at least $305,000.00, which is the amount of the offer made and the amount Mrs. Taylor testified that it was worth in its present condition.

The value of the real estate, the Taylors' home, was significantly understated. The difference is sufficient to cause a trustee to administer the property.[13] While Mrs. Taylor suggests that she did not know the true value until the October 2000 listing, the fact remains that the valuation espoused by Mr. and Mrs. Taylor throughout 2000 was grossly inaccurate. Mrs. Taylor argues that she relied upon the Prince William County tax assessment. Real es-

12. It is not clear why chapter 11 plan payments continue to be made if Mr. Taylor received a chapter 7 discharge in his 2000 chapter 7 case.

13. Whether the house is worth $305,000 or $345,000, there was significant equity available for the benefit of unsecured creditors in Mr. and Mrs. Taylor's prior chapter 7 cases. A value of $345,000 would indicate gross equity of about $100,000.00 in the property. This is an amount that would have substantially paid the unsecured creditors had they not been discharged in the prior two cases. At $305,000, there would have been about $20,000 available for distribution to unse-

cured creditors in the prior chapter 7 cases after payment of the costs of sale and administrative expenses. At $345,000, there would have been $55,000 available. The schedules in the two chapter 7 cases listed the Internal Revenue Service as a priority creditor with a claim in the amount of $40,000.00 for income taxes for 1986 and 1987. The schedules are not clear as to when the tax return was filed or why these should be considered priority claims. (No Tax claims were scheduled by Mrs. Taylor in her chapter 13 case). The chapter 7 schedules also listed an additional $40,123.00 in unsecured non-priority claims.

tate tax assessments are required by Virginia law to be at fair market value. Va. Code Ann. § 58.1–3201 (Michie 2000). However, it is well known that the tax assessments lag behind the actual market value when the market is rapidly appreciating. While the county real estate tax assessment may be a factor in assisting in the formulation of an opinion of value, the rapid increases in market value of real estate in Northern Virginia during the last three to four years render them unreliable without further investigation. Here, in the light most favorable to Mr. and Mrs. Taylor, neither appears to have made any investigation of the actual fair market value of their home. They failed to annotate their schedules with the fact that the value they were relying upon was the real estate tax assessment. Had they done so, a creditor who read the schedules would have been alerted and could have made a further independent investigation. More significantly, even after Mrs. Taylor discovered the true market value of her home in October 2000, she made no effort to amend her schedules. This discovery was within 30 days after the first meeting of creditors in both Mrs. Taylor's chapter 13 case and Mr. Taylor's chapter 7 case and before the expiration of the objection period to Mrs. Taylor's first chapter 13 plan. More egregiously, she referred to the incorrect valuation of the house in her January 29, 2001, plan. In Mr. Taylor's chapter 7 case, the chapter 7 trustee filed his no distribution report on October 12, 2000. Had Mr. Taylor promptly amended his schedules, the trustee could have withdrawn the report and administered the property. That case was not closed until January 5, 2001.

The schedules are deficient in another respect. Neither petition filed on August 24, 2000, disclosed a petition pending by a spouse. Technically, it is true that only Mr. Taylor's petition is deficient in this regard since at the time that Mrs. Taylor's petition was filed, 10:27 a.m., Mr. Taylor's petition had not yet been filed. It was filed nine minutes later at 10:36 a.m.

### Treatment of Creditors

The treatment of creditors is a factor in determining whether sequential filings are appropriate. All creditors should be considered, both those scheduled in the initial chapter 7 case and those scheduled in the subsequent chapter 13 case. In these cases, the creditors are identical. There are no new creditors. It is, therefore, unnecessary to examine how any new obligations arose, whether they are related to the prior circumstances that gave rise to the chapter 7 filing or are independent of those circumstances, and the effect of new creditors on the fundamental fairness of the effective treatment of the creditors in the two cases.

Mrs. Taylor's chapter 13 case could have been filed as a joint petition by both Mr. and Mrs. Taylor on August 24, 2000. Instead, Mr. Taylor chose to file a separate petition pursuant to chapter 7 of the Bankruptcy Code. The choice is significant. Had he chosen to join Mrs. Taylor in filing the chapter 13 petition, there would have been additional creditors who would have been paid and who would not have been discharged in his chapter 7 proceeding. Moreover, had Mrs. Taylor's chapter 7 petition—which was itself originally a joint petition—been filed as a joint chapter 13 petition, all creditors would have received a distribution and Mr. Taylor would not have needed to seek dismissal as to himself even though it would have been filed 34 days short of the expiration of the six-year bar period for a chapter 7 discharge under § 727(a)(8). There is presently no similar bar for multiple chapter 13 discharges. *Cf.* 11 U.S.C. § 1328 and 11 U.S.C. § 727(a)(8) and (9).

The unsecured creditors are treated in a fundamentally unfair and inequitable manner through the attempted manipulation of the Bankruptcy Code. They receive nothing if these sequential filings are permitted. The secured creditors have already been injured by the delay and the additional arrearage that was first proposed to be paid over five years. The sequential filings abuse both the purpose and spirit of the Bankruptcy Code.

### Fundamental Abuse

The three filings before the court, Mrs. Taylor's chapter 7 case, Mr. Taylor's chapter 7 case and Taylor's present chapter 13 case, seek to accomplish that which the Taylors could not have achieved any of the cases individually. While the discrepancies and convenient changes in Mrs. Taylor's (but not Mr. Taylor's) expenses are a subject of concern, the schedules make one thing quite clear: Mrs. Taylor by herself cannot make any of her proposed chapter 13 plans work. Indeed, there is no feasible chapter 13 plan that she could propose that would repay her creditors unless her husband effectively contributes to the plan payments or consents to the sale of the home. Mrs. Taylor's income is insufficient to fund a chapter 13 plan. Her net after tax income is $2,108.00 per month. The mortgage payment itself is $2,630.00 per month according to her schedules (and $2,914.50 per month according to Ocwen's proof of claim). The total household expenses are $7,712.00 per month. Some of these expenses are clearly the husband's, such as his restitution payment of $1,000.00 per month. Consequently, even though Mr. Taylor filed a separate chapter 7 proceeding, he is for all intents and purposes, a co-debtor in the chapter 13 proceeding. Without him, the chapter 13 plan cannot be successful. He had the opportunity to join in her chapter 13 petition but did not. Instead, he filed his own chapter 7 petition on the same day.[14] The net effect of the manner in which the parties chose to file is to permit the debtors to retain all equity in their home at the expense of their unsecured creditors and to reinstate the long delinquent mortgage. This result is not intended by the Bankruptcy Code and is of akin to the legal fraud decried by the Court of Appeals in *Phillips v. Krakower*, 46 F.2d 764 (4th Cir., 1931) and its progeny. The timing and the sequence of the filings permit the debtors to accomplish indirectly that which they cannot accomplish directly.

In applying the *Deans* and *Cushman* factors, it is clear that the debtors have sought to abuse the Bankruptcy Code to achieve a result that is not permitted by the Bankruptcy Code itself. The *Cushman* factors are compelling. Not only was Mrs. Taylor's chapter 13 petition filed while her chapter 7 petition was pending, her husband simultaneously filed a chapter 7 petition. There is no evidence of any attempt to resolve the matters with the creditors or any change in circumstances. There was no evidence submitted as to why Mrs. Taylor's chapter 7 case could not have been converted to chapter 13 or why Mr. Taylor could not have joined in the chapter 13 filing or conversion. These factors coupled with the debtor's lack of candor reflect the inability to meet the good faith requirement.

### Remedy

 Chapter 13 relief is not appropriate for Mrs. Taylor. The question remaining is the remedy. The typical remedy is to dismiss the chapter 13 filing and let the debtor attempt to resolve his difficulties outside bankruptcy. In the typical

14. The debtors are living together and are represented by the same counsel.

"chapter 20" case, unsecured creditors would not have benefitted significantly had the case originally been filed as a chapter 13 case. Most are properly chapter 7 no asset cases. Typically, there is no equity in the residence sought to be protected and abandoned by the chapter 7 trustee. In many cases, if the chapter 7 case had originally been filed as a chapter 13 case, the chapter 13 plan payments would have resulted in only nominal payments to nonpriority unsecured creditors, the bulk of the payments being directed to arrearages on the house or the payment of priority claims. Consequently, dismissal of a typical abusive chapter 13 case after a chapter 7 discharge neither benefits nor harms unsecured creditors. In this case, however, unsecured creditors would have received a significant distribution in the chapter 7 cases. Dismissal would potentially permit the debtors to benefit from their misconduct at the expense of the secured creditors.

Conversion is appropriate in this case. Mrs. Taylor's actions in her chapter 13 case constitute cause under 11 U.S.C. § 1307(c). Conversion, however, is not a sufficient remedy because all debts (with the possible exception of some priority tax debts) have been discharged in prior proceedings. Conversion to chapter 7 would not change this situation. No creditor would be entitled to file a proof of claim and none would participate in any distribution because of the prior discharges. The appropriate remedy is similar to that crafted by the Fourth Circuit in *Reid v. Richardson*, 304 F.2d 351 (4th Cir., 1962). In that case, sequential filings would have disadvantaged creditors. The Court of Appeals permitted Mr. Reid's case to be re-opened and consolidated with Mrs. Reid's pending case. In this case, absent an appropriate remedy, the same prejudice

that faced the creditors in *Reid* face the Taylors' creditors. The appropriate remedy is to re-open both prior 2000 chapter 7 cases. One was filed simultaneously with Mrs. Taylor's chapter 13 case, the other three months earlier. Both chapter 7 cases were recently closed.[15] By re-opening the prior chapter 7 cases and consolidating them into this case, the creditors scheduled in the chapter 7 cases will be creditors of this estate and will be entitled to a distribution from the proceeds of the sale of the real property.

---

15. Mrs. Taylor's chapter 7 case was still open when she filed her chapter 13 case.